He'll take the first case, which is 17-2210. Counsel, will you make your appearance, please? Good morning. My name is Margaret Cates. I'm an assistant federal defender in the Albuquerque, New Mexico office. I am representing the appellant in this case, Mr. Ochoa-Olivas. He was given a substantively unreasonable sentence for a supervised release violation. After being sentenced to 18 months on a new reentry case, the district court sentenced him to 12 months on a supervised release case. Six months to run concurrently, six months to run consecutively. And that was for the exact same conduct. The new reentry was a violation of the supervised release. And on that new reentry, Mr. Ochoa got two additional points because of the supervised release case. And so that took him from a Category 3 to a Category 4. And going from a Category 3 to a Category 4 made the low end of his sentencing guidelines go from 12 months to 18 months. So in a sense, he already got six months for the supervised release violation. But the question is, why is the supervised release violation sentence unreasonable? And I would answer that with the question, what 3553A goals are accomplished by that additional six months? Respect for the rule of law, deterrence, your client has repeatedly come over the border and has been warned not to come over the border, and continues to come over the border, sounds like a 3553A to me. Your Honor, I think those are mostly all legitimate factors in 3553. But I'll answer that in two ways. One is, with the supervised release violation, not every one of the 3553A factors are considered. Respect for law is not considered? That's actually not one of the specifically delineated ones. But yes, under deterrence and protection of the public.  Those are all relevant aspects. But the fact that he entered the United States at gunpoint, a fact that the district court accepted, found convincing, credible, and compelling. And the government concedes that the court was entitled to do so because the government never objected to any of the facts in the addendum to the pre-sentence report, and never took a contrary position. So given the fact that Mr. Ochoa entered the United States at gunpoint, I think that that changes the conversation. The factors are still the same, and you're right. There's something to be weighed. But let's look at, for example, deterrence. How is deterrence relevant if he entered the United States at gunpoint? Your client was standing at the border when the gun was pulled out, figuratively. I don't know how close he was to the border. But the reality is, why was he at the border to begin with? He had been told, don't come back. And then he comes to the border, and he decides to change his mind at the last minute. Good for him. But he put himself in a situation of being there to begin with. Now, note, it's not like the court ignored the fact that the gun was pulled on him. The court considered that. The court mentioned it. The court said that, I'm taking it into consideration. He could have gotten 12 months running consecutive. Right? Yes. Okay. And he didn't get that. Correct. Okay. So where's the unreasonableness here? And I could see it. We're talking about six months, and maybe for all of us who deal with tenure mandatory minimums and life sentences, six months seems like nothing. But the issue is, if it's wrong, it's wrong, whether it's six months or life, A. And B, if it were me or my loved one having to serve an extra six months unreasonably, I would have a problem with the system. So I think even though it's six months, and we could say, yes, I agree with you. He could have given, he certainly could have given him 12 months consecutively, but that would have been even more unreasonable. And I think the issue is, this is a little bit, this is a unique situation. Counselor, you haven't even convinced me yet that six months was unreasonable, and now you're going to 12 months, B. You better stay with the six months. Your Honor, I intend to stay with six months, and six months is unreasonable. I don't see it. Let's just put it that way. The guidelines, they're all advisory. The consecutive is within his sole discretion. So the fact that he reenters and he gets caught and he pleads guilty to that, he's also in violation of supervised release, which is unusual sometimes in sentencing is to give that to a person that's being deported again. He comes back. It runs consecutively. That's all within the standard of law. You still haven't shown me anywhere that that is unreasonable. Okay. Then I need to do a better job convincing you that it's unreasonable. So let me try. Here's why it's unreasonable. Because the court's job is to give a sentence that is sufficient without greater than necessary, to accomplish the sentencing goals. So what are the sentencing goals? Those are set out in 3553A. Judge Holmes just laid them out. So when we look at those, given the fact that the court accepted the duress explanation for entering. And I think that's interesting. And that's your best argument, that he just accepted the duress and lowered it to six months? He said, I was going to give you 12. Right. But I'm only going to give you six. But that's within his discretion. What makes it unreasonable? Okay. So you have to look and see if there's an abuse of discretion. So the abuse of discretion, I'm not saying that it was whimsical or capricious. I think it was manifestly unreasonable because if you believe, as the court did, that he entered the United States at gunpoint, how is it reasonable to So far I believe that, counsel. So I'm saying, if we do, and we should, because we defer to the district court on this, if we believe that, how is it reasonable to give somebody another six months? Because the law says he can give it to him another six months, and it's not unreasonable for him to do that. Well, but I think, here's why I think it's, I don't think the law says that he can. The law says that. Wow. Well, here's what, I think if we look at Gall, okay? Gall, the Supreme Court addresses the issue here with, we're talking about appellate review. He can't, at the district court level, he can't assume that the guidelines are reasonable. No. He can't, he can't just adopt the guidelines without considering more than that. And so what I'm saying is, if we, as we all agree, it sounds like you agree, that he entered the country at gunpoint. No, I'm saying that the court accepted that statement. Correct. That's what he did. So this court may, but is not required, to apply a presumption of reasonableness, which it sounds like the court is suggesting. But even if the court does apply the presumption of reasonableness, that can be rebutted by a demonstration of showing that the sentence, in light of the totality of the circumstances, is unreasonable. And I think we've shown that. We've shown that. You think you've shown that. Yes. But I can't speak for my colleagues, but you haven't shown me that. That it's unreasonable. Yes. Let me, let me, let me, let me try again, Your Honor. So the thing that stood out to me and what I thought was unique about this is, if it weren't for the fact that somebody had a gun held to their head and was told they had to enter, I think this would be, as the court says, a mine run case. But I think that that is such a unique feature, and it goes to the issue of voluntariness. I'm not suggesting voluntariness to the level that he had a trial duress defense. But because it goes to the level of voluntariness, and the fact that the court accepted it, what is accomplished by the additional six months? So it's not just generally is it unreasonable. It's unreasonable looking at the totality of the circumstances. 3553 factors. What is accomplished by the additional six months if somebody is held at gunpoint? And the things to look at. Deterrence. And quickly, if I may, just as a side thing on deterrence, even though I think someone holds a gun to your head, I don't think deterrence is really a relevant issue. But if it is, if you look under 5D1.1 in the guidelines, it specifically says, you pointed it out, Your Honor, that in the case of a deportable alien, ordinarily supervised release shouldn't be reimposed because we assume that the deterrence and protection of the public is adequately addressed on the new sentence. Right? He got the new 18 months. But beyond that, the district court just gave him supervised release again, an additional deterrence. So, I mean, I think that's a size. It's unsupervised supervised release, right? It's unsupervised. Yes. Presumably he'll be in Mexico. Presumably he'll be in Mexico, I hope, for a period of time as opposed to coming back again. Right? And I think that's likely that he will because his sentence went up so exponentially. His underlying sentence was like six times greater. Can I just address the point that you brought up, Your Honor, about it sounded to me like you were saying that he took some guilty act. He might be guilty and just for getting to the border and perhaps even hiring the. Well, look, whether he's guilty of something or not, in terms of when you think about deterrence, part of it is do you think about people will put themselves into a situation where bad stuff happens. If I walk into a bank, you know, they made a crime of this, I think. But if I walk into a bank thinking about I'm going to rob the bank and, oh, I decide all of a sudden I'm not going to rob the bank, I happen to have a gun and somebody sees me with that gun and, boom, oops, it's over. Now, what am I going to tell with a wonderful defense lawyer like you? What am I going to say later? Oh, well, you know, I had changed my mind, Your Honor. I really wasn't going to rob the bank. That's not what I wanted to do. It's just things got out of control. Well, in this situation, the guy walks himself up to the border. He's about to cross the border. He says, oh, well, you know, I don't really want to go over the border. Well, you're going to go over the border because I got a gun against your head. He put himself at the border after being told time and time again when the district court had this litany of the times that he's come into this country and essentially thumbed his nose at the authorities and walked right back in, yes, I'm saying don't come near the border where some guy will put a gun in your head. That's exactly what I'm saying, and I think that is deterrence, but you keep him from committing a crime. I'm not saying that that in itself was a crime, the fact that he was at the border. He can be at the border if he wants, but, you know, I think it's undisputed why he was at the border. He was going to cross. When he admitted that, right, he admitted that's why he was at the border. Yes, that he had already paid a smuggler to cross him, and then he thought better of it, didn't want to do it, and the smuggler pointed a gun at him and told him, you will go across, and, Your Honor, I understand your argument. It's an argument that the government makes, but we don't punish people for going to the border, for wanting to cross, for wanting to return to their families. We don't give them credit for that either, and the point here is not punishing him for the act of being at the border. What we're doing is deterring him from engaging in the potential for criminal conduct. If you do things that put yourself in a situation where things like this are going to happen, what did he do? He paid somebody. Do we have a conspiracy charge? We could have that, too. Did he pay somebody to take him over the border? Yes. And so next time, will he think about, twice, about whether paying somebody to take him over the border, sans gun or not? Maybe. That's the critical point. But that's the critical thing. I think the gun changes the equation, and we can't overlook that. But what I'm struggling with is this. But we don't punish people perspectively. And so, I'm sorry. Deterrence, general deterrence, relates to both the public, and it also, in specific deterrence, relates to him. And I'm saying that the court, within its reason, could have said, I'm going to deter you, you, so that you will know next time you will think twice before you do this. And when I looked at the transcript, there was a lot of talk of sort of unfairness by virtue of what the guidelines were doing. You know, the guidelines were giving him a higher sentence because he kept violating the law. If he didn't keep violating the law, he wouldn't have been in the band to get the 18 months that he got, right, on the underlying offense. Well, Your Honor, that's another whole issue. But I think, obviously, incremental punishment makes sense. I understand that. We do that in our life with our children. And I get why the justice system does that. But his sentence increased exponentially, right? Like, his sentence went from 90 days to 187 to 18 months. So, I mean, it already increased exponentially. And partly due to the enhancements that the guidelines put on for him violating supervisory leave, right? Well, and I realize I'm not here to argue the underlying re-entry case. I get it. I want to reserve the rest of my time. Of course. But I just want to say, I don't think we punish people prospectively. And I think it's unfair to say, oh, okay, we understand you entered under duress with a gun. But you shouldn't have been near the border. I think that's unfair. And I don't think that it's analogous to going into – The word is specific deterrence. It is not prospectively punishing him. It is specifically deterring him from engaging in situations that will – and actually engaging in criminal conduct of paying somebody to take him across the border. Right? But the issue is the supervised release violation was not paying somebody to take him across the border. The violation was coming into the United States. And that's what we have to look at. And how did he come into the United States? And I will reserve the rest of my time. Thank you. You bet. Good morning. Good morning. My name is John Balla, and I'm an assistant United States attorney from the District of New Mexico. Ochoa Olivas came before the District Court for sentencing on a new illegal reentry offense and revocation of a term of supervised release in this matter after sustaining three convictions related to his illegal entry or reentry into the United States and one prior drug conviction. Just seven months before he came before the District Court for revocation of supervised release in this matter, he had been sentenced by the same district judge on his third illegal reentry offense. The district judge recounted all the warnings that he gave to Ochoa Olivas seven months earlier to deter him from coming back to the United States illegally. He remembered telling Ochoa Olivas, quote, don't come back, and here's an additional reason not to come back, because you're under an unsupervised term of supervised release, unquote. He highlighted his common practice of telling reentry defendants, quote, if you come back, the sentences get longer and longer and longer, so don't come back, unquote. In spite of the District Court's earlier efforts to deter Ochoa Olivas from returning and in spite of all the criminal consequences that he faced in his prior illegal reentry cases, he came back to the United States just seven months earlier. Well, the argument is that he came back under – he doesn't use the defense of duress. He claims that he came back under coercion. Where was he apprehended? He was apprehended in a landfill called Camino Real Landfill in Salmon Park, New Mexico. The name of the landfill was in the PSR. The distance from the border was not, but I think the court can take judicial notice that it was about two miles away from the border. Was his assailant still with him? No, the PSR doesn't indicate that it was. It just indicates that he was with one other alien. Do the records show that being that far that he could have turned around and gone back? I don't think the record indicates anything about whether he could have gone back. But he was at least two miles by himself away from the border. He was with one other alien who had illegally reentered. And that was not the coercive individual? The record doesn't – the PSR doesn't indicate that it was. Okay. And we can – I think we can assume that it wasn't. I have – so in considering all the prior times that Ochoa Olivas illegally reentered the United States, the district court focused obviously on deterring future criminal conduct and it imposed a sentence at the low end of the commission's policy statement. Let me ask you about the future conduct issue. I think it is in the record that essentially the draw for the defendant to come to the United States was his family, right? And it's my understanding his family is now back in Mexico. So should the district court – and if I'm correct about that, should the district court have taken that into consideration in calibrating the need to impose punishment to specifically deter him? I think the court can take that into account because we don't know if his family is going to return to the United States. And if it does, then that – his conduct in this case indicates that he has a strong motivation to continue returning to the United States. If he does have family here who has troubles, his first impulse is to come back to the United States illegally. So I get – yeah, I get that. But my understanding was his family is not here, right? Yes. And even if they're not, though, we don't know what their plans are in the future. And so you'll still have this impulse in him to come back to the United States if his family does return. The – you know, at least as I understand the defendant's argument, it turns a lot on the parsimony principle and the idea that the sentence should not be any more severe than necessary to achieve the goals of sentencing here. Why – what is your best argument for why this isn't too much? I mean, you know, I mean, he had already gotten 18 months for the underlying crime. He was situated to – he got unsupervised release. I don't know whether his history will predict this, but at least the inference would be that he would turn around and go back to Mexico. So arguably, the answer would be this is an unnecessary pound of flesh to impose in addition to what he's already received. I mean, what's your response to that? Judge Holmes, I think your point in response to my colleague's answer when talking about the partial duress or coercion here answers why this additional time was necessary. Of course, Sotolo Levis didn't raise the affirmative defense of coercion or duress in the district court as an affirmative defense to criminal liability for the illegal reentry, but he did argue partial coercion or duress at sentencing. However, looking at the way that this court treats coercion or duress as an affirmative defense to criminal liability also shows why it wasn't really a compelling factor at sentencing and why there is still some need to impose additional time to deter him from returning to the United States illegally again. And specifically, what do you mean by that? The way that we framed coercion or duress, how does it indicate that his argument and use of it is not compelling here? There are two things that can disqualify a person from raising an affirmative defense of coercion or duress to a new charge. The first is that in continuing offenses like reentry, a defendant has to immediately report himself to the authorities once the coercive factors have lost their coercive force. That's in Portillo-Baga 478F3-1194 from 2007. The court in that case likened it to, likened illegal reentry specifically to escape and said that, quote, demanding a prompt and appropriate remedial response to the claim duress is a legitimate precondition to recognizing the defense and is also a useful tool in measuring the bona fides of a claimant, unquote. Well, in this case, Ochoa Olivas didn't report himself immediately to the authorities. He came into the United States and, in fact, tried to hide from authorities. He was found while he was hiding in the bushes in the landfill from the Border Patrol agents who eventually apprehended him. So I think that that is that in the record. It is. Yes. And so that's an indication that he still has some deterrent effect that needs to be imposed upon him in order to prevent him from coming back to the United States illegally. I think if he had a complete change of heart, he would have come to the United States after the man pointed the gun at his head in Mexico and just immediately run to a Border Patrol agent and turn himself in rather than trying to hide from a Border Patrol agent. But more I think more relevant for our purposes is the point that you brought up again, Judge Holmes, regarding recklessly placing himself in the situation that caused the coercion or duress. And the Court addressed that in Vigil 743 F. 2nd 751 from 1984, where the Court held that a defendant cannot raise coercion or duress as an affirmative defense if the defendant recklessly placed himself in the situation where he was coerced to commit a crime. And this, of course, stems from the core principle that duress or coercion is only available as a defense if you truly had no choice in the matter. But if you recklessly placed yourself in the situation where you should have seen or you did see and recklessly disregarded the risk that you would face coercion or duress, then the crime really was a product of your free choice. Can I follow up on something with you? So you were talking to Judge Holmes about that the draw for this defendant to come to the U.S. was that his family was here. And the other thing that's in play, and now they're not here, but the other thing that was in play in this case is the idea that he had changed his mind once he got to the border. So it seems to me he wants to have it both ways on that issue, that he was sort of disavowing the idea that he was coming here for, that his family was a strong enough draw to make him come because he came to the border and decided to abandon that idea. Should we really be considering now the fact that his family, post him getting arrested, moved back to Mexico? Again, I agree. I don't think that's particularly compelling in his favor, given that he may have other reasons to come back to the United States or his family may return to the United States at some point. And if that's the case, then he has demonstrated that he has an impulse to come back when things get bad and that that will continue to exist in the future if circumstances change from the way that they are now. So I make other points in my brief regarding statutory, regarding the statutory weight of the factors that a court considers upon revoking supervised release. But I think that Ochoa Olivas' history and actions that led to revocation in this case evoked a serious concern that he was going to continue returning to the United States illegally if the court showed any lenience to him whatsoever. And in order to rebut the presumption of reasonableness. And the court did show lenience to him. I mean, the court could have run his sentence 12 months consecutive, right? Correct, Your Honor. And was advised to do so by the guidelines. Exactly. The guidelines do indicate that when a person faces revocation of supervised release, as well as sentencing on a new matter, even if they're for the exact same conduct, the entire, the sentences should run entirely consecutively. And he did accept the, he did accept Ochoa Olivas' mitigating factors that he advanced. And he took that into consideration in determining how much time to run consecutive or concurrent. Do you think on the facts of this case that the court could have even varied upward? Probably not. Yeah, I mean. Not something you've probably considered in light of the posture of the case, but. I certainly, I would feel comfortable defending the case if he had varied upward slightly. Just given the fact that there were three prior illegal reentries in a prior drug crime. And that the reentries happened in such rapid succession. I mean, his, the chronology of his offenses were that he was convicted of illegal reentry and false claim to citizenship in 2007. Possession of 15 to 100 grams of cocaine in state court in Illinois, where the police reports indicated that he sold a kilogram of cocaine to an undercover officer. Two years later in 2016, he was convicted of illegal entry misdemeanor. And I suppose got a break in that case. And then again in 2016, he was convicted of illegal reentry when he came before Judge Johnson, the same district judge who sentenced him in this case. And he got sentenced to six months in that case. And got placed on supervised release. And nonetheless, he immediately returned. So I think that it, I think an upward variance could have been defensible in this case to some extent. What's the maximum for him? Do you know off the top of your head what his maximum would have been? The statutory maximum? Yes. 20 years. Based on his criminal history? Actually, no. He has to be convicted of an aggravated felony in order for the maximum to be 20 years. His prior possession case, I suppose, was not an aggravated felony because it was only charged as possession. It likely would have only been 10 years for prior conviction of a felony. Okay. Thanks. If the panel has no further questions, I'm happy to return the rest of my time to the Court. Thank you, Counsel. Thank you. Just to respond to a couple of points. One, that being that there's a difference between a trial duress defense versus this Court has recognized that an imperfect defense of duress or coercion is a legitimate sentencing argument. And that's we're not making a trial defense. And I don't think that there, with respect to why didn't he turn himself in once he got across the border, I think that's speculation. We could speculate that perhaps he didn't know where the gunman was or the gunman told him, you stay here for a certain amount of time. So we didn't know that. We would ask that you reverse and remand. Thank you. Thank you. Thank you for your arguments, Counsel. The case is submitted.